UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY LUCKERN,<br>Plaintiff,<br>v.<br>NICHOLAS COCCHI ET AL.,<br>Defendants. | Civil Action No. 20-30170-MGM |

MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 67)

November 23, 2026

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Following this court's previous, partial summary judgment ruling, (Dkt. No. 92), Laurie Benoit ("Benoit") and Joseph Zwirko ("Zwirko") remain as Defendants. Three counts remain as to both: Count I (Violation of the Eighth and Fourteenth Amendments of the United States Constitution), Count III (Intentional Infliction of Emotional Distress), and Count IV (Deliberate Indifference to Serious Medical Needs, Constituting Cruel and Unusual Punishment). Counts I and IV appear to be 42 U.S.C. § 1983 claims alleging a violation of the Eighth Amendment prohibition on cruel and unusual punishment. The court will follow the parties' lead and analyze Counts I and IV together.

For the following reasons, the court will grant, in full, Defendants' motion for summary judgement as to Defendant Benoit. As to Defendant Zwirko, this court will grant the motion for

summary judgment with respect to Count III and deny the motion for summary judgment with respect to Counts I and IV.

## II. STANDARD OF REVIEW

"The function of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Thus, "a nonmovant can forestall summary judgment by 'present[ing] definite, competent evidence' demonstrating the existence of a genuine dispute about a material fact." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law,'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). At summary judgment, "the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018). But the court may not evaluate the credibility of witnesses or weigh the evidence, as those questions are reserved for the jury. *Id.*; *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).

## III. BACKGROUND

The following facts are drawn from the undisputed facts, and the disputed facts with all reasonable inferences drawn in Plaintiff's favor. *See Higgins v. Penobscot Cnty. Sheriff's Dep't*, 446 F.3d 11, 12 (1st Cir. 2006). While Defendants properly dispute that some of the following events

occurred, Plaintiff provides support from the record for his position, including via Plaintiff's own testimony during his deposition. *See* Fed. R. Civ. P. 56(c)(1)(A).

On August 30, 2017, Plaintiff, who at that time was an inmate at the Hampden County Correctional Center ("HCCC"), injured his right thumb while playing basketball. (Dkt. No. 77 ("Pl. SOF") ¶ 1.) Later that day, Plaintiff was taken to Baystate Medical Center ("BMC") where X-rays revealed Plaintiff had suffered a fracture in his right thumb. (*Id.* ¶¶ 2-3.) BMC medical staff placed Plaintiff's right thumb in a splint that was secured by an ace bandage. (*Id.* ¶ 4.) An orthopedic surgeon at BMC recommended that Plaintiff be seen by a hand specialist for a follow-up within ***2-3 days***. (Dkt. No. 77-3 at 6.) At the time of his injury, Plaintiff was under the direct medical care of Defendant Benoit, a nurse practitioner employed full-time at HCCC. (Pl. SOF ¶ 7.) Upon review of Plaintiff's medical record the very next day, Benoit contacted Defendant Zwirko, an orthopedic physician assistant employed full time at New England Orthopedic Surgeons ("NEOS"), and also per-diem with the Hampden County Sheriff's Office ("HCSO"). (Dkt. No. 69 ("Defs. SOF") ¶ 7; Dkt. No. 77-8 at 2.)

Benoit relayed to Zwirko what had transpired with Plaintiff the day prior, and noted that BMC recommended Plaintiff be seen for a follow-up within 2-3 days. (Dkt. No. 77-8 at 2.) Benoit inquired if, despite BMC's recommendation, it was acceptable for Plaintiff to wait to be seen by Zwirko the following week, when Zwirko would be at HCCC, or if "[Plaintiff] need[s] to see someone . . . sooner." (*Id.*) Zwirko responded that he would be at HCCC on September 8, 2017, and "that should be fine." (*Id.*) In the interim, Benoit ordered X-rays for Plaintiff on September 1, 2017, which showed "no apparent change" from Plaintiff's prior X-rays. (Pl. SOF ¶¶ 19-20.)

On September 2, 2017, Plaintiff was placed in the segregation unit at HCCC as a punishment for a disciplinary infraction. (Dkt. No. 77-9.) On September 3, 2017, the ace bandage holding Plaintiff's splint in place was confiscated by a correctional officer who mistakenly believed that ace

bandages were categorically banned in the segregation unit. (Pl. SOF ¶ 23.) As a result of the confiscation, Plaintiff's broken right thumb was not properly immobilized. (*Id.* ¶ 25.)

On September 4, 2017, Plaintiff reported that his ace bandage had been removed to Michael Hall ("Hall"), a registered nurse working in the segregation unit. (Pl. SOF ¶¶ 26-27.)[1] Hall told Plaintiff that he would speak to Benoit about the situation. (Pl. SOF ¶ 28.) The following day, Hall told Plaintiff that he had in fact informed Benoit that Plaintiff's ace bandage had been removed and that Plaintiff was in pain. (*Id.* ¶ 29.) Hall told Plaintiff that Benoit's only response was that the Plaintiff would be seen later in the week. (*Id.* ¶ 30.)

On September 7, 2017, Plaintiff was seen for the first time by Defendant Zwirko at HCCC. (Pl. SOF ¶ 31.) During that visit, Plaintiff explained to Zwirko that his ace bandage had been removed from the splint by a corrections officer in segregation, and he asked Zwirko to secure the splint with compression tape. (*Id.* ¶¶ 35-36.) Zwirko refused, explaining that he believed Plaintiff could use the tape to hang himself. (*Id.* ¶ 37.) Instead, Zwirko attempted to secure the splint with a knee brace which did not properly immobilize Plaintiff's broken thumb. (*Id.* ¶¶ 38-39.) On September 8, 2017, Zwirko updated Benoit on his plan to "cast" Plaintiff the following week. (Dkt. No. 77-8 at 1.) Zwirko did not actually cast Plaintiff, however. (*Id.*)

On September 12, 2017, Plaintiff was released from segregation and returned to the general population. (Pl. SOF ¶ 51.) On September 13, 2017, Plaintiff went to Health Services and requested that his splint be properly taped, since the knee brace that Zwirko had used was loose and ineffective. (*Id.* ¶ 53.) Upon an additional visit with Zwirko on September 14, 2017, Zwirko finally wrapped Plaintiff's splint with compression tape. (*Id.* ¶ 59.) Plaintiff experienced significant pain during the entire period his broken thumb was not properly immobilized. (*Id.* ¶ 60.)

---

[1] The court previously dismissed Hall as a Defendant in this action in its earlier, partial ruling on Defendants' motion for summary judgment, (*see* Dkt. No. 92).

On October 2, 2017, Plaintiff was seen by Benoit. (Pl. SOF ¶ 63.) Benoit ordered X-rays and physically examined Plaintiff's broken thumb. (*Id.*) Based on her evaluation, Benoit concluded that Plaintiff should continue to wear a splint. (*Id.* ¶ 64; Dkt. No. 77-5 at 57-58.) Plaintiff's medical records noted Benoit's recommendation to this effect. (*See* Dkt. No. 77-7 at 23.)

Plaintiff again saw Zwirko on October 12, 2017. (Pl. SOF ¶¶ 66-67.) Zwirko reviewed the October 2, 2017 X-rays and conducted another physical examination of Plaintiff's thumb, which revealed ongoing limited range of motion, swelling, and tenderness of the proximal phalanx. (*Id.*) Despite the X-rays and Zwirko's physical examination both indicating that Plaintiff's broken thumb had still not fully healed, *and despite Benoit's written recommendation to the contrary*, Zwirko recommend that Plaintiff begin (1) wearing a non-rigid neoprene thumb splint in place of the rigid fiberglass splint Plaintiff had previously been wearing; and (2) squeezing a stress ball with the broken thumb. (*Id.* ¶ 68.) Zwirko also referred Plaintiff to physical therapy at HCCC. (*Id.* ¶ 69.) In making these decisions, Zwirko did not consult with: (1) Benoit; (2) Zwirko's supervisor at HCCC, Dr. Thomas Lincoln ("Lincoln"); or (3) Zwirko's supervisor at NEOS, Dr. Vanderzanden. (Pl. SOF ¶¶ 76-78.)[2]

On November 6, 2017, additional X-rays of Plaintiff's broken thumb revealed "persistent mild displacement" of Plaintiff's bones. (Dkt. No. 77-3 at 18.) That same day, Plaintiff began a physical therapy course with Patrick Carley, D.P.T. ("Dr. Carley") at HCCC. On November 16, 2017, Dr. Carley, in Plaintiff's treatment note, documented that he believed Plaintiff "could have benefited from the application of at least a full cast to stabilize the fracture, which did not happen." (Dkt. No. 77-7 at 30.) In response to Plaintiff's concern that he would not be able to return to his

---

[2] During her deposition, Dr. Vanderzanden explained that because she was the orthopedic surgeon on call during Plaintiff's ER visit to BMC on August 30, 2017, she was "to some degree . . . [a] part of [Plaintiff's] care team," and, as Zwirko's supervisor, it was important for Zwirko to keep her updated on Plaintiff's course of care. (Dkt. No. 77-11 at 25, 32, 39-40.)

work as a carpenter, Dr. Carley noted that in "[his] opinion [Plaintiff] will ultimately regain full functional use of [his] thumb to be able to return to his occupation as a carpenter." (*Id.*)

On November 16, 2017, Plaintiff visited with Zwirko once again. (Pl. SOF ¶ 84.) Zwirko reviewed the November 6, 2017 X-rays and conducted another physical examination of Plaintiff's broken thumb which revealed that the thumb had rotated. (*Id.* ¶¶ 85-87.) That Plaintiff's thumb had rotated was concerning to Zwirko. (Dkt. No. 77-6 at 79.) While it was Dr. Vanderzanden's expectation that she would be made aware if Zwirko observed something concerning with Plaintiff's broken thumb, (*see* Dkt. No. 77-11 at 49), Zwirko did not discuss this observation with her. (Pl. SOF ¶ 90.) Nor did Zwirko consult with Benoit or Lincoln. (*Id.* ¶ 91.)

Given Zwirko's concern, Zwirko referred Plaintiff to be seen by Dr. Vanderzanden herself at NEOS. When making the referral, however, Zwirko did not specify a timeframe in which Plaintiff should be seen by Dr. Vanderzanden. (Pl. SOF ¶ 94.) Plaintiff eventually met with Dr. Vanderzanden on January 19, 2018. (*Id.* ¶ 101.) X-rays and a physical examination of Plaintiff's broken thumb by Dr. Vanderzanden revealed a clear deformity to the thumb. (*Id.* ¶¶ 102-03.) Dr. Vanderzanden informed Plaintiff that his injury was permanent. (*Id.* ¶ 104.)

## IV. DISCUSSION

### A. Counts I and IV

Plaintiff advances two theories of liability relative to his deliberate indifference claims: "The first theory concerns the conduct of [Defendants' Benoit and Zwirko] while the Plaintiff was being housed in the segregation unit . . . from September 2, 2017, through September 12, 2017. The second theory concerns the overall course of care provided to the Plaintiff by NP Benoit and PA Zwirko from August 31, 2017 through January 19, 2018." (Dkt. No. 76 at 4.) Because the court's conclusion, discussed below, is consistent as to each Defendant with respect to *both* articulated theories of deliberate indifference, the court will analyze the two theories together.

1. Legal Standard

It is well established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.'" *Abernathy v. Anderson*, 984 F.3d 1, 6 (1st Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To succeed on an Eighth Amendment claim of this kind, "a plaintiff must satisfy both a subjective and objective inquiry: he must show first, that prison officials possessed a sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety, and second, that the deprivation alleged was objectively, sufficiently serious." *Leavitt v. Correctional Medical Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011) (internal quotation marks omitted).

"Deliberate indifference under [the] subjective prong requires evidence that the failure in providing treatment to the plaintiff was purposeful." *Abernathy*, 984 F.3d at 6. "This prong can also be met by showing a 'wanton disregard to a prisoner's needs . . . akin to criminal recklessness, requiring consciousness of impending harm, easily preventable.'" *Id.* (quoting *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014)). "Thus, an 'inadvertent failure to provide adequate medical care' does not give rise to a constitutional claim." *Id.* (quoting *Estelle*, 429 U.S. at 105-06); *see also Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 162 (1st Cir. 2006) (describing deliberate indifference as including a "narrow band of conduct" in which the care provided is "so inadequate as to shock the conscience"). "While it is true that the conduct must be intentional, rather than merely negligent, the motive or purpose of the conduct need not be a sadistic infliction of bodily harm to reach the level of deliberate indifference." *Brison v. Wellpath*, LLC, 662 F. Supp. 3d 67, 75 (D. Mass. 2023) (citing *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011)).

Where a prisoner has received some medical treatment, but the adequacy of that treatment is at issue, "federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims which sound in state tort law." *Bradshaw v. Corr. Med. Servs., Inc.*, 6 F. App'x

45, 46 (1st Cir. 2001) (quoting *Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir.1981)); *Kosilek*, 774 F.3d at 82-83 ("[A]llegations [that] simply reflect a disagreement on the appropriate course of treatment . . . fall[ ] short of alleging a constitutional violation." (quoting *Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir.1980) (alterations in original))). "Therefore, substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007). The First Circuit has, however, upheld deliberate indifference claims where there is evidence of continuous missteps, changes in position, and poor explanations for an inmate's treatment plan. *See Battista*, 645 F.3d at 455 (upholding district court's ruling in finding deliberate indifference where "[prison's] action[s] [were] undercut by a composite of delays, poor explanations, missteps, changes in position and rigidities—common enough in bureaucratic regimes but here taken to an extreme").

For the objective prong, a Plaintiff "must show that [he or] she has a serious medical need for which [he or] she has received inadequate treatment." *Kosilek*, 774 F.3d at 85 (citation omitted). "A significant risk of *future* harm that prison administrators fail to mitigate may suffice under the objective prong." *Id.* (citation omitted (emphasis added)); *see also Perry v. Roy*, 782 F.3d 73, 79 (1st Cir. 2015) (for the objective prong, "[e]ven a significant risk of future harm may suffice").

2. Analysis

As to Defendant Zwirko, when construing the facts in the light most favorable to Plaintiff, the court agrees with Plaintiff that "a reasonable jury viewing these facts could . . . conclude that . . . PA Zwirko demonstrated a stark and prolonged pattern of deliberate indifference to . . . Plaintiff's serious medical needs over the entire course of . . . Plaintiff's care." (Dkt No. 76 at 18-19.)

*First*, upon Benoit informing Zwirko that BMC recommended Plaintiff be seen for a follow-up within 2-3 days of his initial injury (*i.e.*, August 30, 2017), Zwirko responded that seeing Plaintiff on September 8, 2017, (***8 days*** after the injury) "should be fine," without any explanation. There is

no evidence in the record that Zwirko reviewed Plaintiff's medical records before making a starkly different determination than what was suggested by BMC staff who had actually seen the injury.

*Second*, when Plaintiff explained to Zwirko that his ace bandage was removed from the splint by a corrections officer in segregation and asked Zwirko to secure the splint with compression tape, Zwirko refused, explaining that he believed Plaintiff could use the tape to hang himself. Instead, according to Plaintiff's account, Zwirko attempted to secure the splint with a knee brace which did not properly immobilize Plaintiff's broken thumb. However, Zwirko failed to inquire into *why* Plaintiff was in segregation, which would have revealed that Plaintiff was *not* there on suicide watch (in which case tape would be banned) but, rather, was in segregation due to a disciplinary infraction. Moreover, a reasonable jury—drawing inferences in Plaintiff's favor—could find Zwirko's use of a *knee* brace to secure a *thumb* injury was inadequate treatment of a serious medical need and exhibited deliberate indifference.

*Third*, despite Zwirko telling Benoit that he would "cast" Plaintiff, Zwirko never actually did so, abandoning that plan. Plaintiff's physical therapist, Dr. Carley, noted that Plaintiff "could have benefited from the application of at least a full cast to stabilize the fracture, which did not happen. The result is a 1.5 to 2 mm separation of the two fragmented sections of the middle phalanx that has resulted in a slightly larger thumb." (Dkt. No. 77-7 at 30.)

*Fourth*, even though the October 2, 2017 X-rays and Zwirko's physical examination of Plaintiff's thumb revealed that Plaintiff's thumb had not yet fully healed, *and despite Benoit's recommendation to the contrary*, Zwirko recommend that Plaintiff begin wearing a non-rigid neoprene thumb splint in place of the rigid fiberglass splint he was wearing and begin physical therapy. During her deposition, Dr. Vanderzanden testified that she would "probably not" have recommended Plaintiff begin physical therapy if she had reviewed Plaintiff's October 2, 2017 X-rays. (Dkt. No. 77-

11 at 37.) But Zwirko did not consult with Dr. Vanderzanden (as she would have expected he would), nor did Zwirko consult with Benoit or Lincoln.

*Fifth*, despite admitting that he grew concerned upon realizing on November 16, 2017 that Plaintiff's broken thumb had rotated, Zwirko did not consult with Dr. Vanderzanden (again, as she would have expected he would), or with Benoit and/or Lincoln. *Finally*, even when referring Plaintiff to be seen by Dr. Vanderzanden at NEOS, Zwirko did not specify a timeframe in which Plaintiff should be seen or note the urgency of the matter. As a result, Plaintiff was seen by Dr. Vanderzanden on January 19, 2018, more than *2 months* after the referral.

On this record, the court agrees with Plaintiff that a reasonable jury could find that "the deliberate indifference shown by . . . PA Zwirko to the Plaintiff's serious medical needs was not isolated to a particular date or time." (Dkt. No. 76 at 18.) That is, a jury could find that Zwirko's "action[s] [were] undercut by a composite of delays, poor explanations, missteps, changes in position and rigidities." *See Battista*, 645 F.3d at 455. While there is no evidence in the record of a sadistic motive on the part of Zwirko, such a motive is unnecessary. *Id.* As to the objective prong of the deliberate indifference claim, Defendants concede that "Plaintiff's fractured thumb was a serious medical need." (Dkt. No. 68 at 11 n.1.) Because there exists a genuine dispute as to material facts, Defendants' motion for summary judgement is denied with respect to the deliberate indifference claims as to Defendant Zwirko. *See United States v. Assorted Jewelry Approximately Valued of $44,328.00*, 833 F.3d 13, 15 (1st Cir. 2016) ("Summary judgment is appropriate [*only*] where there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law.").

As to Defendant Benoit, however, even when construing the facts in the light most favorable to Plaintiff, the court finds that no reasonable jury could conclude that Benoit acted with deliberate indifference.

Benoit saw Plaintiff *the day after* his BMC visit and *that same day* reached out to Zwirko, delivering BMC's recommendation that Plaintiff be seen for a follow-up within 2-3 days of his injury. What Zwirko, on his own, decided to do after hearing BMC's recommendation does not support the claim against Benoit. As Defendants correctly observe, "NP Benoit is a primary care provider, she is not an orthopedic specialist." (Dkt. No. 68 at 13.) Benoit deferring to Zwirko was certainly reasonable. Plaintiff draws attention to the fact that BMC's discharge note indicated that the follow up should be with Dr. Vanderzanden herself at NEOS. (*See* Dkt. No. 76 at 10.) But Dr. Vanderzanden's own testimony belies this claim. Dr. Vanderzanden testified that the reason her name was on the BMC referral was because she was the orthopedic surgeon on call during Plaintiff's visit to BMC and that it was simply an "*option* to call [her]." (Dkt. No. 77-11 at 26-27 (emphasis added).) Dr. Vanderzanden further testified that "as long as [Plaintiff] was seeing somebody [she] trusted and know[s] that [Plaintiff] is getting care," there was no reason for Plaintiff to see her specifically. (*Id.* at 30.) As noted earlier, Zwirko worked with Dr. Vanderzanden at NEOS and clearly fit within the category of someone she trusted to provide adequate care. Accordingly, there is no *genuine* dispute of material fact with respect to Benoit's decision to contact Zwirko at NEOS (who happened to also work at HCCC, per-diem), instead of Dr. Vanderzanden directly.

Plaintiff further contends that Benoit's refusal to provide care to Plaintiff upon learning from Hall that Plaintiff's ace bandage was confiscated is further evidence of deliberate indifference. While the court requested supplemental briefing on whether Hall's statements with respect to her conversation with Benoit are admissible (as either admissible hearsay or non-hearsay), the court determines that disposition of this evidentiary issue is unnecessary: Even if all of Hall's statements with respect to her conversation with Benoit are admissible, there is nothing within those statements that would indicate deliberate indifference on Benoit's part. Plaintiff contends that Hall notified Benoit sometime on September 4, 2017 about the ace bandage issue to which Benoit responded that

Plaintiff would be seen in a few days by Zwirko. Indeed, that is *exactly* what actually happened; Zwirko saw Plaintiff three days later, on September 7, 2017. Not only was Benoit's statement truthful, but given that Benoit was not the hand specialist—rather, that was Zwirko's specialty—it was reasonable that she deferred the issue to Zwirko who was *already* scheduled to see Plaintiff only three days later. Even if it can be argued that Benoit's response, or inaction, constitutes sub-standard medical care, there is no indication of the kind of purposeful or reckless conduct on the part of Benoit to sustain a deliberate indifference claim. *See Abernathy*, 984 F.3d at 6. More generally, this *single* instance of inaction falls far short from the *pattern* of deliberate indifference shown by the defendant in *Battista*. *See Battista*, 645 F.3d at 455 (finding deliberate indifference where defendant's "action[s] [were] undercut by a composite of delays, poor explanations, missteps, changes in position and rigidities").

Moreover, upon review of the October 2, 2017 X-rays, and a physical examination of Plaintiff's thumb, Benoit recommended that Plaintiff continue to wear a splint at that time. It was Zwirko, not Benoit, who 10 days later, and after reviewing *that same set of X-rays*, concluded that Plaintiff should begin wearing a non-rigid neoprene thumb splint in place of the rigid fiberglass splint Plaintiff had previously been wearing. More generally, as Plaintiff himself admits, Zwirko did not regularly update, or consult with, Benoit on Plaintiff's thumb treatment plan. Plaintiff cannot at the same time fault Benoit for Zwirko's treatment mistakes.

Because the court finds that no reasonable jury could conclude that Benoit acted with deliberate indifference towards Plaintiff's serious medical needs, the court grants Defendants' motion for summary judgement with respect to the deliberate indifference claims against Defendant Benoit. *See Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025) ("If the court finds that no genuine issue of material fact exists and that no reasonable jury would favor the nonmoving party, then it must grant the moving party's motion." (citing Fed. R. Civ. P. 56(a))).

**B. Count III**

Using mostly the same facts supporting his deliberate indifference claims, Plaintiff advances intentional infliction of emotional distress claims against both remaining Defendants (Count III). For the following reasons, this court grants Defendants' motion for summary judgment as to Count III.

1. Legal Standard

To succeed on an intentional infliction of emotional distress ("IIED") claim, Plaintiff must show that Defendants "'intended, knew or should have known that [their] conduct would cause emotional distress; 2) that the conduct was extreme and outrageous; 3) that the conduct caused emotional distress; and 4) that the emotional distress was severe.'" *Lech v. von Goeler*, 92 F.4th 56, 76 (1st Cir. 2024) (quoting *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014)). Extreme and outrageous conduct has been interpreted to mean "behavior that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Roman v. Tr. of Tufts Coll.*, 964 N.E.2d 331, 341 (Mass. 2012)).

2. Analysis

Plaintiff cannot meet this difficult standard. There is nothing in the record that would support a reasonable jury finding that Benoit or Zwirko knew their actions would cause emotional distress, that their actions were, at any point, "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," or that Plaintiff actually suffered severe emotional distress as a result of their conduct. Accordingly, summary judgment in Defendants' favor is appropriate as to the IIED claims against Benoit and Zwirko.

Plaintiff contends that, after he informed Benoit on February 6, 2018, that he did not wish to proceed with the MP joint fusion surgery that Dr. Vanderzanden had suggested, *later that day* Benoit refused Plaintiff's request to discontinue Tramadol and revoked Plaintiff's work clearance. (Dkt. No. 76 at 19-20.) Plaintiff asserts that a reasonable jury could conclude that "NP Benoit sought to punish the Plaintiff because she was angered by the fact that he had refused the surgery after spending months bothering her about it." (*Id.*) This argument is unsupported by the record. Moreover, as Defendants correctly observe, (Dkt. No. 84 at 10 n.7), even *if* true, this stand-alone incident does not rise to the level of extreme and outrageous conduct required to support an IIED claim.

Plaintiff testified that, even *prior* to February 6, 2018, Plaintiff attempted to decline Tramadol, but Benoit refused to discontinue that medication. (*See* Dkt. No. 77-2 at 273.) Plaintiff further testified that he told Benoit about his desire to reject the MP fusion procedure for his broken thumb *prior* to February 6, 2018. (*Id.* at 274.) Indeed, HCCC medical records establish that on February 6, 2018, Plaintiff visited with a registered nurse, not Benoit. (*See* Dkt. No. 77-7 at 63.) Additionally, HCCC medical records, and Plaintiff's testimony, reveal that despite Benoit's revocation of Plaintiff's work authorization, Plaintiff continued his prison work. (*See* Dkt. No. 77-7 at 66 (Plaintiff reporting on February 15, 2018, that he is "still working in the woodshop")); (Dkt. No. 77-2 at 278 (Plaintiff testifying that even after February 6, 2018, he continued working in the "tool crib").) On this record, any connection between Plaintiff's declining the MP fusion procedure on February 6, 2018, and Benoit's actions that day, is tenuous *at best*, and cannot support an IIED claim.

## V. CONCLUSION

For the reasons explained above, this court grants in part and denies in part Defendants' motion for summary judgement. (Dkt. No. 67). Specifically, this court grants, in full, Defendants' motion for summary judgement as to Defendant Benoit. As to Defendant Zwirko, this court grants the motion for summary judgment with respect to Count III and denies the motion for summary judgment with respect to Counts I and IV.

It is So Ordered.

_/s/ Mark G. Mastroianni________
MARK G. MASTROIANNI
United States District Judge